at all, No. 10-2865. Mr. Schuster, Mr. Barnett. Thank you, Your Honor. May it please the Court, I propose that we will first look at the liability issues, then damages, and I would like to reserve three minutes for rebuttal. That's fine. Thank you. Individual issues predominate among the members of the class on the question of antitrust impact and its error for the District Court to find otherwise. In a portion of this decision from which neither side appeals, the District Court amended plaintiffs to establishing antitrust impact. What's the geographic area that you would choose? Well, according to the enhanced substitutability test, that leads to a geographic area, geographic market of the individual household. So, isn't there a, isn't the problem with counsel that the term geographic, relative geographic market is being used in a critical way? On the one hand, is a term of order in antitrust law to which the demand substitutability definitions attach, as you've listed in your briefs. On the other hand, when we're talking about class certification, we're talking about the aggregation of claims. And it seemed to me that perhaps what the District Court was speaking about was what's the region in which claims could sensibly be brought together and looked at for common proof. Now, if that's what the court was doing, even if the court used the term relative geographic market in a way that's not typically used, what's wrong from a class certification standpoint with asking a question about aggregating claims across a geographic region? Your Honor is correct. The term geographic market is being used in a couple of different senses here, but let me answer that question directly. There's nothing wrong with making that inquiry on class certification. But here, the geographic market delineated by plaintiff's liability expert, Dr. Williams, was simply adopted. When the District Court limited plaintiffs to establishing impact via their theory that Comcast conduct deterred cable overbuilding, that should then drive how you arrive at a class. The two million class members who live in over 500 different cable franchise areas, cable overbuilding takes place on a franchise area by franchise area basis. But the argument was being made, and the District Court accepted it, that even where the overbuilding hadn't yet arrived, there was, and I don't mean to be, in certain words, a judge of perilous mouth, but I took him to be saying, or accepting the argument, that there's a ripple effect that has, even where it hasn't hit yet, the effects of that overbuilding approaching have a moderating influence on the pricing decisions of the operator, the cable operator, the incumbent. So if he accepts that that's something that could be subject to proof, whether it's proven or not, is something entirely different, but subject to class-wide proof. How is that an abuse of discretion? How is that an abuse of discretion? First, I don't think that's what the District Court found. Plaintiffs had a theory that by having different cable providers in different parts of the geographic market, subscribers could benchmark cable prices against one another. The District Court actually rejected that theory, and I'm not aware of any other evidence that's been presented that unless two cable providers are competing at the same household with overlapping cable systems and are both in a position, actually, to compete for the business of an individual subscriber, that there's some pricing effect somewhere else. That evidence was not made, and there's nothing in the District Court's decision that suggests that there's a pricing effect where an overbuilder is not present. Now, that's remarkable, because I understood the District Court's reasoning to be, look, there's FCC report, GAO report, multiple academic studies that talk about the influence of an overbuilder's presence in the market, and I'm prepared to accept that, and I'm also prepared to accept that even if the overbuilder hasn't hit franchise market X, if it's hit franchise market X minus one, that the expert's opinion that that's still going to have a monitoring effect is one that I think is enough that it could be considered as a point of proof. Now, is that not what he was saying? I don't believe so. A lot of plaintiff's liability experts have a purely hypothetical model of cable overbuilding in which he seems to posit that that's a potential effect. That's an empirically unverified model, and there is no other evidence in the record that I would tell the Court that when the FCC, for example, evaluates whether a cable franchise area is subject to effective competition under its test, it only looks at where there are directly overlapping cable systems, and where the second overbuilder is having an actual direct effect on pricing, what I think. So by your reasoning, if you had a circumstance where, say, you're in Bucks County, and you've got 20 different franchise licensing areas, and you've got 18 of them surrounding two in the middle where there hasn't been overbuilding, but then 18 all around there has been, by your license, it would be an abuse of discretion for the judge to say, look, I'm saying Bucks County's up for grabs because even though all 20 aren't in, but there are two that haven't been overbuilt, the influence of the overbuilding in the other 18 is sufficient for me to believe that this could go to a jury and put their proof on. There, the district court would be considering evidence that because the overbuilder was present in 18 franchise areas, that was having some competitive effect, or the incumbent first-entering franchisees, say Comcast in the other two franchise areas, had a concern that they would enter, right? And therefore, there's a moderating effect on prices. That actual scenario is radically different from the one we have here. Here, actually, RCN, the one overbuilder that did enter, entered in about 18 franchise areas out of the 500-plus in the alleged geographic market. So there has to be a showing. In order for there to be an argument that a barrier to entry or some other conduct had an effect on an overbuilder entering, or the threat of an overbuilder entering had an effect on the competitive or pricing behavior of the incumbent in another market, there's got to be evidence of it. And here, what we're suggesting is that only a small segment of class members live in areas that were actually overbuilt. That's a handful of franchise areas in Delaware County. All the other class members live in over 500 franchise areas that had never been overbuilt. So is that a good argument at trial? Well, it goes to the question of impact, because what evidence are placed... That would be your argument at trial. It has very little effect on the bottom-line pricing because it's only in Delaware County. Well, we would suggest that it goes to the question of whether the class has common proof, whether common proof genuinely predominates among the members of the class in all the different franchise areas they live. If the only evidence they can point to is the fact that the overbuilder is in 18 franchise areas, 20 franchise areas in Delaware County, that's just not enough evidence for the other class members to make a short of impact. They cannot rely on that evidence. What I'm saying is you may be right, but overbuilding is just one of the factors you look to. Your point is, hey, folks, in this case, the overbuilding, the fact that it may affect prices and diminish them, would only apply in Delaware County. Therefore, you should not take this into account at all because it's de minimis. Well, the question is whether a class of members living in over 500 different franchise areas can really properly say, my evidence of impact is based on what Comcast did and the effects it had in Delaware County. Take an individual class member. Say there's an individual class member who lives in Berks County, which is fairly remote from Delaware County for purposes of cable franchises. And that class member goes and files a complaint and says, Comcast engaged in certain conduct that affected an overbuilder in Delaware County. Therefore, I have a claim. The question would come back, well, what evidence do you have that that overbuilder, who was affected by that conduct, ever would have overbuilt in your franchise area so that you're injured? But that's not this case. That's not a case here. The case here is clustering. Well, but clustering to avoid overbuilding. Regardless, it seems to me you're arguing the flip side of these cases. Your Honor, by clustering, plaintiffs refer to transactions by which Comcast acquired other first entrant franchise incumbent cable. That's a Section 2 violation. Okay, but they were not cable overbuilders. The companies that Comcast acquired, regardless of whether the term clustering is used, whether the transactions are relied upon for an individual class member to establish impact, they only had one cable provider before. They have no impact unless they can show that, but for the complaint of conduct, they would have had two. Otherwise, they have no injury. There's no impact for them. All of the class members, but for the ones who live in a handful of overbuilt counties in Delaware, all of them only had a single cable provider before the complaint of conduct. They only had one after. But doesn't your argument really go to the merits? Your Honor, it goes to whether— I mean, when I say the merits, it seems to me that the question that's hanging out there is whether or not there really is anything such as overbuilding. Well, overbuilding—first, I think our argument goes to how the class is going to go about proving the merits. Overbuilding, the plaintiffs themselves allege in their complaint, takes place in 1% of cable franchise areas nationwide. Paragraph 41.3. I'm sorry. Approximately 1% of all cable franchise areas nationwide. The plaintiffs here have to show that it would have taken place in 100% of the 525 cable franchise areas in which they live. Can't they ask there to be inferences? I mean, can't the district court say, look, we've got evidence here that you were doing things, Comcast, to try to prevent RCN from moving out into new areas. You were locking up local contractors, preventing them from working with RCN. You were actively impeding RCN from moving into other markets, and that from that, it's at least possible to draw an inference that RCN was active, was going to be active, was going to be moving out, and that these steps were taken to prevent competition, anti-competitive behavior. Why isn't that evidence, which I understand you dispute it, and if there's other evidence, I read your stuff, but why isn't that a basis on which the district court, within the bounds of its discretion, whether any of us would have made the same decision in the first instance or not, but within its discretion, could say, I think that's enough to say inference possible, class-wide proof. Go ahead. First, the inference is simply not possible if it's going to be applied that broadly to another 500 different franchise areas. Part of what this court said in hydrogen peroxide is that the court has to look at what evidence is there for the class to prove its claim. It is not a sound exercise of the district court's discretion. Actually, having been on the panel on hydrogen peroxide, the question is evidence that is capable of common proof. Not that you have to prove it. No doubt. We don't get that far under the weeds. Sorry. No, go ahead. They have to prove they can prove it. And the district court can draw an inference if there's evidence there from which an inference, I suppose, can be drawn, but not draw an inference based on some presumption that the class should be certified or to be fair to the plaintiffs. And the evidence, is it fair in your world, if I were to say to you that hydrogen peroxide looks at whether there's enough evidence presented that makes it plausible that a case could be made on full review at trial? I think that's a fair statement of the standard. And you're saying that they haven't done enough here to even make it plausible enough. Let me just address briefly, because on the subject of RCN and whether Comcast engaged in any anti-competitive conduct there, and I know we're not going to make decisions on the merits, but I will say this, two things. One, RCN itself said in public SEC filings, beginning in 2001 for the 2000 financial year, which was the first year in the class period, that it lacked the funds to expand beyond the franchise areas that it had entered. RCN witnesses, Rule 30b-6 corporate spokesman witness, testified that RCN did not lack for construction contractors. The Second Circuit said in the Tenneco v. FTC case, where the FTC elicited non-party testimony, and that non-party testimony was dispositive on an issue. They have to live with that testimony. I understand you have evidence that you like. But evidently, there was some evidence that Judge Perdomo looked at and said, I'm going to credit that, at least at this point. And there's some contrary evidence in the record, right? And you'd acknowledge that. I would not acknowledge, in all honesty, that there's any evidence that was presented that RCN, as a theoretical entrant, had the intention, the preparedness, the means, the wherewithal, or had taken any affirmative steps that would suggest it was in any way capable of entering 500 different franchises. Well, that really wasn't my question. That aside, I don't think there's any other evidence. And apart from RCN, no other potential over-builder was identified. Where is the impact? Again, I go to the individual class member. Saying that clustering has some effect, without showing that my life would have been different, I would have enjoyed different competitive circumstances. But for the complaint of conduct, that then you're just stating a theory. If you want to show impact, you have to show your life would have been different. You would have had two cable providers, not one. Let me shift gears on you here, if I can. You have argued, specifically, that what's certified here is a per se class, and that that was error. But looking at the district court record, there's a letter in there from March 25, 2009. It's docket number 328. And in there, you actually say, with respect to the issues, and this is on the last page, with respect to the issues to be addressed in the new class certification motion, Comcast is prepared to stipulate that the only issues to be resolved are those of antitrust impact and methodology of damages. If those are the only two things that are in the mix at the certification hearing, or the new certification hearing, because that's what you guys told the district court judge, how can you be arguing right now that the district court judge was wrong somehow in not making a different statement about the framing of the antitrust violation? Because the impact showing, plaintiffs are arguing that the impact showing for them is less onerous if they have to show it on a per se claim rather than a rule of reason claim. I don't think they're right. I think they still have to show impact. You make your pitch on that to the district court judge. I mean, I don't understand anything about his certification order to say, and this is a per se violation. It's framed as a question, whether this is a per se violation, right?  Why can't, I mean, how did he misstep by saying, okay, that's a point that can be argued? Well, let me say two things. One, one of the purposes of taking a 23-F appeal is because there is hydraulic pressure to settle when there's class certification. The pressure is much greater when it's a per se claim or potential per se claim than a rule of reason claim. I would certainly acknowledge that. It makes perfect sense to me. But you keep talking about this in terms of he's certified a per se class. I understood him to be certified a class and allowing one of the questions to be litigated, whether there's a per se violation. Well, it's a matter of, the question has been litigated. I mean, we've made legal arguments to the court, and the court has consistently held that it thinks that the transactions that are complained of can be per se violations. That is a straightforward area of law. They can't be. But what you're talking about, this sounds like, I think what Judge Orr would say, this is a merits issue. And why should we decide that? Why isn't that decided at trial? Because the plaintiffs, or one of the plaintiffs' claims is that the transactions were market allocations and everybody in the alleged geographic market was affected on a per se basis. Automatic. You have the agreement. I don't have to show the facts. But didn't all that Judge Padova do was certify this claim for class treatment? That's it. He's not ruling that there's a per se violation. He's certainly not ruling that there is a per se violation, but he's allowing a plaintiff, and there's no reason to believe Judge Padova won't instruct the jury this way. He's allowing plaintiffs to argue that the transactions are market allocations that affect all class members. So there's no reason to believe he won't instruct the jury this way. Aren't you taking several giant steps down the road and assuming that you make your presentation, as a matter of law, in an appropriate motion? He denies it. He rules it is per se. And then he instructs the jury. I mean, don't you have a whole lot of steps to go before you're at that point? Right now we're being presented with a class that certifies as part of it. The question of whether there's a per se violation. Well, I think on a 23-F appeal, if the district court certifies a class to pursue a claim that doesn't exist, that's error. And the claim, a per se claim, does not exist here. It cannot exist. It's error. Should we be waiting for the U.S. Supreme Court to decide a Wal-Mart v. Diggs case to decide this? I don't think. I think this issue has been decided. I mean, the Supreme Court decided in the broadcast music v. CBS case that mergers are not subject to per se treatment. It was very clear about that. I got to go back to my question, Mr. Schuster. If you told the district court, we're not going to be talking about the violation. We're not going to talk about any choice violation. We're only going to talk about impact, and we're only going to talk about damages. So nothing else is on the table for you right now. How can you fault the district court for taking the inch of word? I guess if the district court hadn't specified in its amended class certification order that it was certifying a class to pursue a per se claim, I'd have less of a basis. But it expressly said, didn't it say it's allowing it to pursue a claim, and it's allowing it to pose the question of whether it's per se? Well, let me say this. Yes, that's what the district court was doing, but the district court was specific in saying it's allowing a class to pursue a per se claim. And I'm suggesting the reason that this goes to impact is because the per se claim is a market allocation claim, and it's an attempt to avoid the requirement that I'm submitting is there to establish that there would have been entry in individual franchise areas, or at least that there was a perception that there could have been entry in individual franchise areas, and that had a competitive effect on pricing. So by pursuing a per se claim, I think plaintiffs are trying to avoid making that showing. And that's why I think the per se claim is relevant here. I know we didn't hear you on damages, but why don't we hear from Mr. Barnett, and then we'll get you back on the rebuttal in response to any issues that come up pertaining to damages. You can deal with that at that point. Thank you. Your Honor, if I may please call it up very last. Plaintiff's indicted, Robert is here, will be at council table. Just your exactly right, this is a question of aggregation. The question is whether there were similar competitive choices among all of the members of the class within the Philadelphia DMA. So whether this is strictly a proper geographical definition or not. Judge Padova did not make an error in certifying the class. His ruling that competitive effects were the decisive question to be asked, as to all class members, is correct and supported by abundant evidence. Even if he did make an error on the relevant geographic area, is there enough on the record for us to make a determination? About whether? About whether or not the relevant geographic area should be an individual home versus Well, Judge Padova decided. There is definitely conflicting evidence about that. Your Honors are probably aware that there were something like 32 different expert reports that were submitted by eminent economists on both sides. And Judge Padova faithfully to the hydrogen peroxide case, that two of the three, two of the three people were on there are. So I'm not telling the cow how to eat the cabbage, but if there's conflicting evidence, it's up to the district judge to make a hard call about whether or not there's enough evidence that he was more right than the other. Well, I guess with my question, I could just finish it. If, in fact, we conclude that they made the wrong call, and on the relevant geographic market, do we have to send it back for that? I guess it depends, Your Honor. One, you think it's not the appropriate geographic market. If the conclusion of the panel is that Judge Padova made a legal error and he did the Padova test, I think he did a Padova test. He applied the SEC's test to lay aggregate on the household. The precise assumption I get is that he asked what area, what area do these people have similar competitive choices. One of the questions might be, was it appropriate for him to apply the commercial realities test rather than the demands and ability test? That's the test that this court has been applying at least since the murder of Lansdale. Judge Almasert wrote a very scholarly and, to me, very compelling opinion about why the plaintiff was wrong in saying that they established the relevant geographic market as a matter of law. The court could have been clearer in saying, that's a fact question, and that's what we have here. Judge Padova evaluated the evidence. He did exactly what you all instructed him to do. He did a rigorous assessment. He had four days of testimony. He read all of those reports. He was his heart. He did a relevant discovery. After 102 products came down, he said, I didn't get it 100% wise. There were some questions that I didn't answer. I didn't make findings as to. And so he made the hard decision, reopened the discovery, allowed a great deal of additional information to be provided, and had the whole line of evidence. I just appreciate that he looked at it. The takeaway from hydrogen peroxide is that when you look at what was done with respect to the rules in 2003, or thereabouts, and decisions, you're not going to certify a class as easily as you might have. You have to get a little more into the maths and see if the claims are plausible and that they are capable of on a class-wide basis. I think that's what I'll try. Absolutely. I'm going to try. So why don't you speak to what Mr. Schuster was saying. His assertion, as I understand it, is that since the only theory that Judge Padova gave a path to, so you can go ahead with it,  and there's a relatively speaking minuscule number of areas within the 600-plus franchise areas in the DMA that had any presence at all by an overbuilder. It can't be the case. There's no evidentiary foundation for an assertion that the competitive environment was the same at the top of Berks County and at the bottom of Kent County in Delaware. How do you respond to that assertion that there just is not enough, this is just too thin a reed to establish a claim across a couple of dozen counties on? Your Honor, I heard counsel say there's no evidence that that could possibly happen. I looked at Judge Padova's opinion, and that is 29 through 40-plus overbuilders do exactly that thing. In page 12, he points out that Comcast conduct led to rates being increased or maintained above a level that would prevail in the absence of that conduct throughout the Philadelphia DMA. Right, and I understand that's his conclusion. I'm asking you to respond to their assertion that there's no evidentiary basis to support that. So I understand that's his conclusion. What's the evidence that you have that responds to their argument that RCM was there in a handful, a small handful of the over 600 franchise license areas? Your Honor, in the opinion of the judge, it deals with a starting place from that, and there's 10-plus pages after that where he reviews the evidence, including the cure codes and studies the academics did to support the conclusion. What do you rely on? Well, I rely not only on that, but I also rely on the fact that from the senior declaration with experts that RCM had an intent, experience, ability, and capital needed to overbuild the Philadelphia market. The high officer of RCM, a gentleman named Scott Barnside, who took his deposition, he said that RCM had significant capitalization at the time, without a doubt had the largest and best capitalized, having raised to $4 billion. They went through that $4 billion real quick, didn't they? They did, Your Honor. And you know why they did? Because it's really tough when you've got a monopolist who's trying to fend you off. They've been extraordinarily successful in preventing people from overbuilding. Well, Mr. Schuster says to us, that capitalization, that testimony about the capitalization, goes to the period before the class period, if I have the argument right, that in the class period, these guys were out of cash, and they were out of steam, and they weren't going anyplace, and you don't have anything, not anything, to demonstrate the contrary. And I guess I'm trying to ask you, other than to say, it's just been overspelling anything that you do, it's only Delaware County. Yeah. What do you point at? Give me, if you can, the specific facts you think about that, or is your position that you don't have to know about it, because what they say doesn't matter? No, I don't. I think Mr. Schuster was very careful in what he said. He didn't say that you're no part of the class period, with RCM actively trying to overbuild. He said, in the first year, they filed an SEC paper that said, things aren't going so great. At the beginning of the class period, they were balling down, they were trying to get overbuilding as much as they possibly could, and they got permission with this OBS certification, which gets around having to go franchise by franchise, so that they could have overbuilt under that OBS certification. It was simply because Comcast was so determined to prevent them from coming in for Vanguard, Delaware County, for example, where they partially did overbuild. They targeted discounts to them, and they said, if we can prevent them from being 30% of the households, that we will kill them. They will not be able to overbuild. They will not be able to be profitable. They will not be able to spay. So we had huge incentives to do it, and the evidence that we've assembled that they did do it is abundant. Is that related to clustering at all? Because one of the things I've been asking myself is, actually, let me just read you one thing real quick from the district court opinion, and have you respond to it, because I'm not sure I understand how clustering fits in here. I hope you'll help me out. Judge Padova said, we conclude with one caveat that the class is ministering to demonstrate that the anti-competitive effect of clustering on overbuilder competition is capable of proof of trial through evidence that is common to the class. The class has successfully shown through Dr. Williams' model, as well as his citations to empirical studies conducted by governmental agencies and private researchers, that the presence of an overbuilder constrains prices. The class has also shown that Comcast engaged in conduct designed to deter the entry of overbuilders into the Philadelphia DMA, including denying Marcion access to services of cable installation contractors. That's from page 174 of 264 of the rules decision. So, how, explain to me if you can, how does clustering, what does clustering have to do with the assertion that the presence of an overbuilder constrains cable prices? Roger, it has to do with the physics, the finances of overbuilding. It would make sense to start someplace and build out from there. If the only way that you can begin is from the edge, it's a lot harder to get into the mass that's been built up there, it's the cluster. If on the other hand, there are interspersed areas where you can build out from, then it's much easier, it's much more likely that you will be able to succeed. So, the very act of clustering. Overbuilders can start anywhere. Overbuilders can start anywhere. In theory they could, Your Honor, but what Dr. Williams talks about in great detail, all credited by Judge Padova, is that if you reduce the borders that are available for an overbuilder to build out from, then it's much more likely that that overbuilder is not going to be successful because it's more expensive, there are fewer efficiencies, and also because the monopolist has a much stronger, costs as much of an incentive to stop you, to expend resources to stop you from being successful. And at that point, I guess Mr. Schuster will speak for himself and say, that's not rooted in any empirical information, that's Dr. Williams theorizing, and that's no basis on which to certify a class. Well, that's pretty remarkable, Your Honor. I guess, in a sense, it's right, but in what sense is it right? There are half a dozen empirical studies done by academics, that have no dog in their spine, who say that overbuilding, I'm sorry, clustering, deters overbuilding, that it increases the profitability of stopping an overbuilder from coming in, and it results in higher table prices for the people who live within the cluster. So, that's not very, very theoretical stuff. That's really, yeah, I mean, we're in the realm of economics. This is an antitrust case. So, we have to rely on that unless we're going to throw it out the door, and we throw out all the antitrust law. I did want to mention one thing about the per se question. Judge Jordan, I think you're exactly right. The only issue that was before the court was antitrust impact, as well as methodology of damages, and Comcast stipulated that there wasn't anything else in the case per se, was one of the questions that Judge Padova was very clear about, that that is a question that will be decided. You dealt with that, I think, on page 51 of your brief. What you're saying is they're trying to smuggle in that issue into the merits issue here. I understand that. We're going to have you turn, unless my colleagues have any other questions, on the first issue, turn to the second issue of damages. Erica, if you would put it up to ten minutes, please. The first question is, your look at the analysis that Judge Padova did of Dr. Williams' theory about the Comcast had affected DVS penetration by the Comcast Sports Network penetration. He rejected that for a number of reasons, and then he allows that to come in with respect to the damages, the penetration rate pertaining to damages. Isn't it what is good for the goose good for the gander, or is it really different that what is allowed and what is not? I should say what is not allowed and that it is allowed. If that were the same thing, that would be true that the DVS penetration that relates as it does to damages has to do with the screening that Dr. McCauley created in order to approximate what a more competitive market would have been. He's trying to get a theoretical way to deal out what that was. Exactly right. So whether or not DVS penetration survived as something that could have caused antitrust injury or common impact, because it is anti-competitive in itself, isn't part of it, as Judge Padova found, that's a valid screen for approximating a more competitive market so that you can get an accurate estimate of what the overpayment, if you will, of the class members was. Judge, isn't the question not what the typical market was but what Philadelphia's market would have been but for the alleged anti-competitive outcome? Ideally, Your Honor, the but-for world would be Philadelphia in a magical place where everything would lie instead of being affected by anti-competitive. Our burden is to show that there was some impact on all class members, not the perfect formula. And I would suggest to you that Dr. McCauley come up with a formula that was conservative in its study. Hold on, back up for a minute. Here's a bit of a problem we have with that. The court says that it's going to accept this. And the language the court used, I think, actually, is that it was trying to come up with the typical market, how the typical market would be. And my question to you is, in fact, let me quote to you from page 184. Typical competitive markets that would satisfy Dr. McCauley's benchmark science do not have Philadelphia's predicted needless penetration by definition of national averages. That's the district court's response to the defendant saying you shouldn't use that. So my question to you is, who cares what the typical market is? Isn't the only relevant question what the but-for market in Philadelphia would be? That's true, Your Honor. What you are striving to do is to say what the but-for market in Philadelphia would have been, what the cost would have been in that but-for market. So if the but-for market evidence is that those DBS penetration rates were going to be, well, anyway, that's the basis, isn't it, on which Judge Padilla says, I'm not finding any trust impact. If that's the evidence, that they're low anyway because FCC said you can do this, how can you get it in the back door and then say, well, this will make it typical, this will give the but-for world if we put this higher DBS penetration screen in place for damages purposes? It's significantly higher. I mean, Philadelphia is what, 9-point-something, 9.4? And Dr. McClave used, what, 15.4, so that's 6 points higher? Yes, he did use a higher rate. I think what Judge Jordan had talked about is kind of bringing it in through the back door and running the argument that that's the basis for antitrust liability. What we have to, the only relevance of that is Comcast's argument that he's using the wrong screen, that that screen's an inappropriate one for possibly the but-for world. Yeah, but when you say it's, you're not going to be arguing it. If it creates an inaccurate comparator, an unfair comparator, it doesn't actually approximate the but-for world, doesn't that in fact make that an invalid damages theory?  Judge Padova, her testimony, this was a different estimate of the but-for world in Philadelphia. Comcast has an argument that it wasn't. That there's a better way to do it or it's impossible. So you're saying that that's really an issue for trial? Exactly. That there would be a good argument for them to make a trial and say, well, Dr. McClave, you had four in the beginning that you sued and now you've got only one. I don't believe you should. It's a pretty good argument, but it's not a class argument. Isn't it a class argument to the extent that goes to the question whether you can have a common damages proof that's class-wide? Their pitch is they can't, they haven't articulated a common proof argument that stands up and here's the reason why this particular piece of Dr. McClave's argument doesn't stand up. If it's true that you don't articulate an argument that's subject to common proof, that's a class argument that goes to damages, right? I know you're not going to admit that that's the case, but it's not purely a merits theoretical issue here. If you don't articulate a theory upon which proof can be offered class-wide about damages, that goes to class certification, does it not? You have to have a methodology that works. I agree with that. Okay. And I'm never saying it doesn't. So it's not so much that it's a merits point, it's that you're saying, well, their argument that it's no good is wrong. I think their argument is that just because it's proven that it works, it's wrong. They're not saying, no, you can fly it. Yeah. I'm sorry, let me just cover another issue. If you look at what we did in hydrogen peroxide, what we said in hydrogen peroxide, we required a rigorous analysis, which was about impact, common proof of impact. If you look at the jurisprudence that has begun to develop, and if you look at some concerns that perhaps one could argue are being signaled by the U.S. Supreme Court in Volner v. Dukes, if in this case here, this whole concept of overbuilding, if it appears that overbuilding is something that just doesn't exist, in fact, doesn't exist in 1.3% of the market here, is it right to procedurally say, yeah, go ahead with this case. We're going to certify it. We can argue over that at some judgment. You can argue it before the jury. Isn't it unfair to defendants to be in a position where the case has been certified, and as they say, gun to their head, and in fact, there is no such thing as overbuilding? If that was the conclusion a person looking at this case came to, isn't the jurisprudence gone to the point that that case shouldn't move forward? I don't think so, Your Honor. As far as the gun to their head is concerned, I was here when we filed this case in 2003, and they were extraordinarily good at resisting all the supposed pressure towards selling the case and the case itself for what they're worth, whether they're certified or not. As far as whether the law is going to go beyond hydrogen peroxide, you are supposed to make an assessment now of the merits one way or another. I don't think you all could have been any clearer than hydrogen peroxide and what we said earlier about Kennedy Bank, Judge Amber, Judge Jordan, the investment case that you don't go beyond. You don't go into the merits. You don't weigh the merits unless it is related to an issue that has to be assigned to Rule 23. I think those questions have been made abundantly clear. That's not a question that is for the court to decide. It is a committed motion for some judgment in which these issues are raised before a judge. Put them out. As Judge Jordan pointed out, there are other rights at the apple as well. We would not have a trial sitting in this case. I don't believe it per se. I think it should. I think that the fact that Brian Roberts sat down and, I imagine, with his counterpart at AT&T, Bob Landon, in May 1999, and agreed the Comcast would not increase its $60 billion bid for a cable giant, and he didn't want. He agreed with Mr. Boomer not to do that. It was a bloody testimony by Mr. Boomer and Mr. Roberts, and the consolation prize to Comcast was Union Philadelphia. Well, since the one theory you're going to get to go forward with, if this is upheld, is that clustering impeded overbuilding, and that's the competitive detriment, I'm going to want to ask you what the defendants argue on page 38 of their brief, that you only had one theory that succeeded out of four, and you haven't demonstrated how your damages theory can be tied to that supposed anti-competitive impact, and therefore you don't have a proper theory to move forward on. Can you respond to that? Absolutely not. First of all, Comcast has said that Dr. McClave said that if you pull out any of the strings, the sweater falls apart. He did not say that. He said that he considered all the conduct as a whole, and what he was trying to identify was super competitive prices. Super competitive prices, by definition, result from anti-competitive conduct, so what he found is not that there was this causal connection between the conduct and the damages that he estimated. He's saying that whatever the anti-competitive conduct was, you just know that it's just this one thing. So that's what the super competitive pricing resulted from. I'm confused, and I apologize. No problem. Comcast told me for a minute that if the theory on which Dr. McClave bases the report is that there are these four kinds of actionable conduct going on, and three of those types of actionable conduct in the plaintiff's view, actionable at least, are thrown out by the district court and said not to be actionable, so that only one remains. How is it that court can say, well, I'm sure that Dr. McClave would have said, oh, yeah, the same damage is associated with this one kind of behavior. I can tell you what Jeff Podella said. He wrote that Dr. McClave's analysis aimed, quote, to isolate the effect of the anti-competitive conduct on price, close quote, and that, quote, any anti-competitive conduct is reflected in the Philadelphia DNA price, end quote. And he concludes that, quote, whether or not we accepted all of Dr. Williams' theories of antitrust impact, McClave models a common methodology available to measure and quantify damages on a classified price assumption which is inherent. So nobody at this stage, does anybody know what Dr. McClave would have said if he'd been asked the question, measure the impact, the damages impact,  Judge Podella asked that very question and provided our responses to it and we submitted answers based on the testimony that had been produced and the reports that had been provided because Judge Podella anticipated the hearing that he wasn't going to allow all three. So we wanted to make sure and we wanted to know what the impact would have been and we anticipated one page. But getting to page 79 through 80, he arrived at this conclusion based on all the evidence. Thank you very much. Thank you. By the way, just coming back up, I would ask that counsel, if they would confer with the court clerk's office afterwards, to have a transcript ordered of this oral argument. Costing split equally. On the subject of damages, I would be grateful for the opportunity to respond on a couple of liability points, but let me start with damages. Just collecting one statement in the record, Dr. McClave in the satellite penetration level that he used, he used a range from 19% to 29%. That's at page 803411. How did you get 15.4 there? That was one of Plaintiff's liability experts who said that if there was a claim of vertical foreclosure of the satellite competitors, they would have had 15%. So the level predicted by the liability expert, that was for a given year, 2005. In that year, Dr. McClave used a level of 22%. The liability expert said in that year it would have been 15%. So even under the best of circumstances, their liability expert is specifying a much lower level of satellite penetration. What is the response to that specification for trial? Well, it's a question of whether Dr. McClave... We're talking about way years, in fact. Well, the issue of the level of satellite penetration shouldn't come into the model at all. It's a question of whether the model is above-form model. Dr. McClave selected... One of his screens was the satellite level of satellite television penetration because that was one of Plaintiff's claims. It would be extraordinary if he could specify a model based on conduct having nothing whatsoever to do with Plaintiff's claims. That's why he did it. When he did it, he did it... But there's some DBS penetration in the Philadelphia DMA, right? Yes. Yeah, but clearly so. But there's some... When he's trying to do it again, he's trying to get a benchmark that is apples to apples. And maybe, because there's some penetration, maybe the rate's not right. Maybe it's skewed significantly. But that sounds like the rate is an issue that has to be worked out at trial. Well, but what Dr. McClave is doing is, based on his specified rate, he's screening out a whole bunch of other markets where satellite television providers also have a level of penetration. He's not taking the prices from those markets, those areas. Those areas have levels of satellite penetration that look more like this area. You have an expert that will take those into account, correct? Well, what we say is, if you're going to specify a but-for model, the model has to be predicated on what the liability case says would have been the competitive circumstances in the geographic market but for the complaint of conduct. The expert here is formulating a but-for scenario that is not grounded in plaintiff's liability case. And the other thing that he's doing, by keeping the satellite screen in the model, when the claim relating to satellite foreclosure has been rejected, his model clearly now is predicated on conduct that is legal. And it's crystal clear that you can't have a damages model that will give damages for conduct that is legal. Well, Mr. Barnett says, hey, just to be able to ask this very question, we put our positions in front of him. He looked at it, and he said, this appears to me to be sufficiently tied to the overbuilding thing. Why is the judge wrong? Well, I don't know that the judge said it's tied to the overbuilding thing. I think he's wrong. The judge would have said that Dr. McClain's use of the satellite screens is an entirely different concept from the liability experts' use of moving forward to the level of satellite penetration. If that were true, that in and of itself would be troubling because it shouldn't be an entirely different concept. Could any of the problems that you've identified, liability or damages, I think that's better, be managed to a degree by subclasses? Potentially, but then we'd be talking about what we think should have been done here from the beginning, is building a class from the ground up based on looking at where is there evidence that there was actual frustrated injury in what franchise areas, what class members can establish that by common proof, and then you could build a class. Whether that would lead to one subclass or how many, 525, I don't know because that exercise has not been engaged in. But we're not saying that under any circumstances there's no possible class that ever could have been constructed here. But at this juncture, there's no basis in the record to construct subclasses. The evidence hasn't been presented. Just one additional word on the subject of damages. We say that Dr. McCrave relies on list prices rather than actual prices, which he does, and the list price is sort of a suggested retail price that Comcast maintains for its pricing areas. The evidence shows that 20% of class members pay a price different from the list price. At any one time in the class period, 20% of class members pay a different price. But you don't pay a payday subscription. That's usually for a temporary period, isn't it? It is, but there's no evidence in the record. First of all, there's no evidence that it's for a temporary class period, but let's assume that it is. There's no evidence that the class members who paid the discounted prices paid any other price, that they were in the class for any other period of time. So when plaintiffs are attempting to rely in part on the McCrave model to establish impact, there's no evidence to differentiate among class members who paid a discounted price and then were gone. And the discounted price could not possibly have been an anti-competitive price because the triple-play price for Wii bundles, for cable, internet, and phone, that's a national price, and it's a flat price. It can't possibly be affected by anti-competitive conduct in one place or another. So you have class members paying prices that may not reflect any damages, may not reflect any impact, and they're in the class. And Dr. McCrave does not provide the judge or the jury any principled basis for distinguishing among those class members. You had a couple of points you want to talk about in the library. Thank you very much. We'll give you five minutes to do that. That's great. Thank you so much, Your Honor. First, on geographic market, not to open up the entire discussion, but there was a statement, my friend Mr. Barnett made a statement, that Judge Padova used the same test the FCC used. Not correct. The antitrust economists of the FCC used the Demand Substitutability Test say that leads to an individual household, but for their purposes they will use individual franchise areas. We'd be happy with that as a reasonable compromised position for purposes of constructing a class, not for purposes of defining a market. But that's what the FCC did. Mr. Barnett said that the judge explains why there's evidence that clustering matures over building at pages 29 to 40 of his decision. And he says there's half a dozen studies to that effect. There are not half a dozen studies to that effect. There's exactly one study to that effect. By plaintiff's liability expert Dr. Singer, prior to this case in which he evaluated one narrow area and he admitted his study doesn't relate to, it only applies to areas where there was analog cable. Here we're dealing with digital cable and that affects the overbuilder's assessment of whether it wants to enter. The rest of that page 29 to 30 is based on the Williams overbuild model. The Williams overbuild model, it is error to say that the Williams overbuild model can in any way, shape, or form be common evidence of antitrust impact. First of all, it doesn't go to impact. All it does is posit in a theoretical way the ideal market circumstances a cable overbuilder would like to face when entering. And it says that, quote, doesn't Dr. Williams very specifically argue, and you're right, there's a sort of a fog of equations that comes at you, but he's with, let me set the trace on math phobia, which I shouldn't be so ready to reveal to the world. But he makes a pretty specific argument, I thought, about the antitrust impact by saying, in response to your own expert's assertion, look, there's a reason why overbuilders show up here and try to overbuild. And there's a way that they overbuild. There's a pattern to it. And there's a way that incumbents respond to it. And here's how they respond to it. And here's why you can believe that in this media market, what Comcast was doing was deliberately endeavoring to keep RCN out of the market because they understood it's going to have something on the order of 5% to 10% hit on their prices. Just the threat of the overbuilder being there is going to have that effect on it. That's kind of a Williams line, right? It is. So if he's got, assume for the sake of discussion, that he's got some things he's relying on there, which could be called evidence that an expert could reasonably rely on, like FCC, GAO reports, accepted studies from academics, how is it that you can say he doesn't even speak to antitrust impact? I understood him to be speaking to it. Because what Dr. Williams says, well, first, he says that a cable overbuilder would like to enter a single franchise area where the franchised incumbent is not also the franchised incumbent in an adjacent area. That doesn't tell us anything about whether the behavior in question actually affected RCN. Here's why. The overwhelming number of individual class members lived in franchise areas that were already clustered together. There may have been a handful of franchise areas that meet the specifications of Dr. Williams' model that were franchise areas operated by an incumbent who didn't operate any franchise areas in any adjacent. But the overwhelming number of class members lived in franchise areas that were already clustered. Dr. Williams' response to that, I think, is there's a discernible effect from bigger multi-system operators. His model is that as long as you put those clusters together, you have an amplified effect. Neither he nor anyone else, if you parse through the studies he relies on, no one has done an empirical study to show that an increase in cluster size has a deterrent effect on cable overbuilding. There's one FCC study in the year 2000 that simply addresses putting together two franchise areas. They call that a cluster. That aside, there was nothing. And Dr. Williams' model doesn't do it. They say it. It sounds good. But there's no empirical evidence to back it up whatsoever. That's the problem with the model. That's why it can't be relied upon. I have 15 seconds. I think I'll move it then. Thank you very much. Thank you to both sides for excellent briefs and excellent oral arguments. As I mentioned, I would like to have a transcript of it. Thank you for coming before us today. Thank you, John.